LaFARGUE v. LaFARGUE.

4-7886                                         194 S. W. 2d 438

Opinion delivered May 13, 1946.

Rehearing denied June 10, 1946.

*Botts & Botts,* for appellant.

*George E. Pike,* for appellee.

GRIFFIN SMITH, Chief Justice. The complaint alleges breach of a written contract. The prayer was for cancellation of a five-year lease of lands, with judgment for $3,356.60. All issues were decided in favor of the plaintiff, who is appellee here.

While the briefs are replete with information regarding two tracts—one containing 305.95 acres, the other 819.69—decree findings that Florence LaFargue was owner of an undivided fourth of the smaller farm and an undivided third of the larger, are not challenged.

E. B. LaFargue died in 1936, leaving four children: Quinn, Lloyd, and Florence LaFargue, and Edna Terrill. At that time Quinn LaFargue was in possession of both tracts through an arrangement made with his father, each of whom owned half of the farming tools and machinery. The acreage is what the witnesses refer to as improved rice lands, with wells, pumping equipment, etc.

Appellee testified that for several years after her father's death, Quinn made some payments to her as rental, but that he did not render an account of any kind —"didn't say anything; just gave me a check."

Edna Terrill testified that she signed a contract with Quinn in 1943 in order to collect the rentals due her—"I thought it would be the only way, except through the Court."

It is in evidence that appellee employed T. J. Moher, a Stuttgart attorney, to procure settlement under her father's will, and that in 1943 she employed G. W. Botts for the purpose of collecting, by legal process if neces-

sary, the rents due for 1942. The suit resulting in this appeal was filed in July, 1944. It was shown that in June, 1943, Quinn LaFargue entered into a written contract with his two sisters to lease their interest in the property for a period of five years, beginning with January, 1943. Mrs. Terrill owned a fourth interest in the smaller (305.95-acre) tract, but she was not interested in the farm containing 819.69 acres. Lloyd owned a fourth interest in the smaller tract and an undivided third of the larger. However, the contract of 1943 was executed by Mrs. Terrill and Florence LaFargue as lessors and Q. D. (Quinn) LaFargue as lessee.

Appellee and appellant disagreed regarding the amount of rent to be paid for 1942, an offer having been made by Quinn to settle for $1,375. With refusal to accept a check for this sum, appellee notified the Smith Rice Mill to withhold, on her account, a fifth of the crop, but the mill failed to do this. Subsequently the disagreement was adjusted through payment of $1,800 to appellee and $600 to Mrs. Terrill. At the same time the rental contract now sought to be cancelled was made. It provides that appellee shall receive a fifth of the rice, but that other crops shall be rent-free. There is this paragraph:

"[The lessee] agrees to make any and all minor necessary repairs; . . . but all major repairs, consisting of repairs to wells or pumping plant machinery or replacing of these items, are to be borne equally by the owners of the land."

There was the further agreement that ". . . the sale of all rice is to be made in the names of the parties hereto and the checks received therefor are to be payable in like manner."

Instead of complying with the agreement that checks should be made payable to appellee, appellant collected the full amount, applied proceeds to his own account, and then offered to settle with appellee after computing the cost of alleged major improvements. Although, according to appellant's own figures, the gross sum paid him by the rice mill for appellee's share was $2,434.60, deduc-

tions claimed for major repairs were $912.78, leaving a balance of $1,521.82. This was tendered and refused.

Appellant insists that in fact major repairs cost $5,022.46. However, he had not claimed the full pro rata due from appellee. If this had been done the amount actually due her, says appellant, would have been $922.82.

An item of $65.80 was charged against appellee "for hauling the rice to the mill and insurance."

It is difficult to determine whether any appreciable part of the charge correctly falls within the contractual provision that appellee shall pay pro rata for major repairs. Much of the work admittedly was done in anticipation of requirements for 1944 and succeeding years. Machinery and parts were virtually unobtainable. An old heavy duty oil engine was purchased in Texas at Tyler and shipped to appellant. It was dismantled so that parts could be used in overhauling power plants. Wells were cleaned, pumping equipment was replaced in some instances, and houses were roofed. Lumber was bought for $646.89, and a carpenter was paid $332.50.

In 1931 appellant was adjudged a bankrupt; yet in 1944, as a witness, he claimed to have spent $42,091.64 on the properties, adding by way of testimony, "None of the other heirs paid out anything."

The evidence clearly shows that appellant had pursued a consistent policy of building up the property, supplying modern machinery as circumstances permitted, and lowering cost of pumping. Indeed, witnesses who charged substantial sums for overhauling wells and engines testified that efficiency of the equipment was probably increased fifteen per cent. There is also testimony by a witness for appellant that incidental repairs to a single engine would vary: one year they would be $150, "and maybe the next year $350."

There is nothing in the contract permitting appellant to build houses and charge a proportionate part of the cost to appellee; and while appellant testified that almost $1,000 was spent for lumber and carpentering, there is

absence of a sufficient showing that this was not done to facilitate appellant and lower his "overhead" costs. The statements filed are somewhat vague, and the claims are based primarily upon appellant's testimony. Our view is that the Chancellor correctly weighed this evidence, and the Court's order of disallowance will be affirmed.

There was included in the judgment an item of $102, representing 1,023 bushels of seed rice stored in the Bauer Elevator at Gillett. Appellee thinks this commodity was produced on lands in which she had an interest. Appellant testified it was grown on a farm he had rented from a third party. We cannot agree with the Court below that appellee established by a preponderance of the evidence that the rice in question came from either tract in which appellee was interested; hence the judgment for $102 must be reversed.

By statute (§ 8599 of Pope's Digest) any person who rents lands and fails or refuses to pay according to the contract, ". . . shall at once forfeit all right to longer occupy said . . . land." The section in its present form appears in Act 129, approved February 24, 1937. It amended Act CXXII, approved April 24, 1901. The 1901 enactment applied to persons who failed to pay rent on any dwelling house or other building. The 1937 statute includes " . . . any person who shall rent any dwelling house, or other building *or land.*"[1] While appellant contends he did not refuse to pay rents according to the contract, effect of what was done is a virtual admission that payment directly to appellee by the mill was circumvented in order to compel acquiescence in excessive deductions appellant undertook to make. The contract gave no such right, and the statute reflects legislative intent in circumstances such as these.

The decree recites that customary rental was a fifth of the rice; as to oats, a fourth. The sum of $820 was adjudged as appellee's part of the oats grown in 1944 and sold—this on the theory that since appellant had

---

[1] Italics supplied.

breached his contract, appellee was not obligated to waive on all crops other than rice. Again we think the Chancellor was correct. The decree was rendered in July, 1945. In November of that year appellant asked that the decree be set aside because appellee had accepted $1,616.68 from the Smith Rice Mill covering 1944 rentals on the basis of a fifth of the rice crop. It was insisted that this constituted ratification after suit for the 1943 claim had been concluded. There was the further contention that appellant did not know, when the decree was handed down, that such payment had been made.

In the motion just referred to there was no contention that proceeds from the sale of oats harvested in 1944 were not mentioned in the suit covering 1943 rentals. We agree with the Chancellor that acceptance of an amount to which appellee was admittedly entitled (or at least the inference is to that effect) was not a ratification of things complained of; nor does a preponderance of the evidence show that appellee was not entitled to $820 if in equity she had the right of cancellation.

As we have heretofore shown, the contract of 1943 was signed by Florence LaFargue, Edna Terrill, and Q. D. LaFargue. Lloyd LaFargue, who was a joint owner of the larger tract, was not a party to the transaction; hence his interests and the interests of Quinn are not an issue. Mrs. Terrill did not own any of the larger farm, but was interested in the smaller one. The question is, May the owner of an undivided interest in lands, who with another owner of an undivided interest has contracted with still another owner of a like interest, procure through equity a cancellation of such contract where one of the signatories has not been made a party to the suit and did not join in the proceeding? Lloyd La-Fargue, who did not sign the contract, cannot be affected except to the extent that his brother, who farms the land and is seemingly well equipped to do so, may be interfered with in orderly operation. But Mrs. Terrill is an interested party, and she is not asking for cancellation.

Thompson on Real Property, v. 4, § 1874, says that where there are four owners in common of business prop-

erty which has been leased to a tenant,[2] the owner of one fourth part, being dissatisfied with the amount of rent received, cannot terminate the tenancy as against the owners of the other three fourths; but the tenant of the property may [in the absence of statutory provisions] continue his occupancy under the authority of the other part owners, and [in the absence of partition] he is liable to pay a reasonable rent to the owner of such fourth interest.

The statement is not entirely applicable to what we are dealing with; but the general principle would seem to be that where owners of undivided interests have jointly and severally contracted with another such owner, as in the instant case, the complaining parcener cannot terminate the lease to the detriment of his or her coparcener, but must find relief at law in an action for damages.

The record before us does not effectively show what proportions of rice or oats were grown on the smaller tract as distinguished from the main farm. Since appellant entirely disregarded his obligation not to collect from the mill money due appellee, it must be presumed that this was his intention when the crops were harvested, and that the act of mingling was an effectual method to prevent a determination of ratios. At any rate, appellant did not defend upon the ground that as to one farm certain rights attached, and as to the other the contract involved a different principle; hence the judgment for $3,356.60 will be modified by eliminating the item of $102, and as so modified it is affirmed. That part of the decree cancelling the lease covering 305.95 acres is reversed and appellant will be permitted to continue under the contract. This is without prejudice to appellee's right to seek damages.

---

[2] The distinction between joint tenancy and tenancy in common is not important to this opinion. Thompson's reference to "four owners in common" is merely an arbitrary reference to numbers; for of course the rule would be the same whether there were three, four, five, or more.